IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ANTARES UNDERWRITING LIMITED on its own behalf as the sole member of Lloyd's of London Syndicate 1274, and as the lead underwriter severally subscribing to energy package policy B1180DQ0068, § § § § § § | |
| Plaintiff, § | Civil Action No. |
| § | |
| v. § | |
| § | |
| MAGELLAN E&P HOLDINGS INC. § § | |
| Defendant. § | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Antares Underwriting Limited ("Antares"), on its own behalf as the sole member of Lloyd's of London Syndicate 1274, and as the lead underwriter severally subscribing to energy package policy B1180DQ0068, files this Complaint for Declaratory Judgment against Magellan E&P Holdings, Inc. ("Magellan"), seeking a declaratory judgment that limited or no coverage is owed under the policy for Magellan's loss of control of Mustang Island Block 926 Well MU-926S #1ST. In support, Antares states as follows:

### Parties

1. Plaintiff Antares Underwriting Limited, is the sole member of Lloyd's of London Syndicate 1274. Antares Underwriting Limited is a private company organized under the laws of England and Wales, with its principal place of business at 21 Lime Street, London, England.

2. Defendant Magellan E&P Holdings Inc. ("Magellan") is a corporation organized under the laws of Texas, with its principal place of business at 2200 W. Loop South, Suite 1050,

Houston, Texas, 77027. Magellan may be served through its registered agent for service of process, National Registered Agents, Inc., at 1999 Bryan Street, Suite 900, Dallas, Texas, 75201.

## Jurisdiction and Venue

3. The court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(2) because the parties are diverse in citizenship: Plaintiff Antares is a citizen of England and Defendant Magellan is a citizen of Texas. The amount in controversy exceeds $75,000, excluding interest and costs, because Magellan's insurance claim exceeds $14 million for the incident and Antares' individual subscription share for the policy is 27.5%.

4. This action is brought pursuant to 28 U.S.C. §§ 2201 and 2202 of the Federal Declaratory Judgment Act, Federal Rule of Civil Procedure 57, and Texas Civil Practice and Remedies Code Chapter 37.001 *et seq*. of the Texas Declaratory Judgment Act.

5. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Magellan resides, has its principal office, and is subject to personal jurisdiction in this district.

6. An actual controversy exists between Antares and Magellan involving the rights and obligations owed Magellan under energy package policy B1180DQ0068.

## The Policy

7. Antares, acting through its wholly owned Lloyd's of London Syndicate 1274, severally subscribed for its own individual share, as the lead underwriter, to energy package policy B1180DQ0068 ("the policy"). The following market severally subscribing to the policy, each for their own individual share, are the members of Syndicates 2003, 510, 1945, 1969, 1183, and StarNet Insurance Company (Antares and the following market are collectively referred to as "the Underwriters").

8. The members of the following market (the other subscribing syndicates and companies) are dispensable parties under Rule 19(b) because they are contractually bound by the policy and by the rules of Lloyd's claim handling agreements to abide by any judgment against the lead Underwriter. *See Corfield v. Dallas Glen Hills LP*, 355 F.3d 853, 862 (5th Cir. 2003).

9. The policy is a Texas surplus lines policy issued to the named insured, Magellan E&P Holdings Inc., at its principal office in Houston, Texas. The policy covers the period June 30, 2020 to June 30, 2021 and provides a limit of liability of $20,000,000 (as amended by the underwriting slip). True and correct copies of the policy wording and the underwriting slip are attached as **Exhibits 1-1, 1-2.**

## The Control of Well Incident

10. Magellan is the owner and operator of offshore Well #1ST, located on the MU-926 Platform, Mustang Island Block 926, in Texas state waters. The original well was spudded in 2006 and drilled vertically to 10,700' (MD). Magellan acquired the well in 2007, plugged it back, and drilled a sidetrack to 11,075' (MD), completing the Well #1ST for production in November 2007. An unmanned production platform was installed in 2011.

11. Early in 2015, the Well developed 1,100-1,150 psi pressure in the 2-7/8-inch production tubing by 9-5/8-inch production casing annulus, indicating a hole in the production tubing. By December 2015, the 2-7/8-inch production tubing by 9-5/8-inch production casing annulus was close to, and tracking the flowing tubing pressure of 3,500 psi, indicating full pressure communication between the 2-7/8-inch casing and the 9-5/8-inch casing caused by a tubing hole. Magellan chose to continue producing the Well and planned to run diagnostics and fix the tubing hole as soon as production from the current producing interval became

uneconomical. When that point was reached, Magellan planned a "through tubing" plug back of the interval to move up the Well, perforate and produce the next productive formation.

12. Magellan continued to produce the Well (with the existing tubing hole), for the next five years.

13. On August 31, 2020, the Well was producing when SCADA equipment on the platform registered an alarm that the surface-controlled subsurface safety valve had activated due to low flow, sealing the production tubing, and shutting in the Well. Due to inclement weather, Magellan's contract engineers were unable to travel to the Well, which remained shut-in. The next day the United States Coast Guard did a fly by and reported a plume of gas emanating from the side of the wellhead and flowing to atmosphere, which diminished significantly by the end of the day.

14. Magellan contracted Great White Well Control to assess the situation and provide well-control services.

15. By September 6, 2020, the necessary offshore equipment and vessels were retained and mobilized from Galveston.

16. By September 8, 2020, Great White Well Control boarded the platform and evaluated the Well, which was emitting a small but unmeasurable quantity of methane gas from a damaged 13-5/8-inch well head side outlet valve.

17. The involved wellhead is installed on the 13-3/8-inch surface casing and the failed valve is on the section exposed to the 9-5/8" production casing by 13-3/8-inch surface casing annulus. The flow of gas cut out the outer flange, the body and gate of the 2-1/16-inch valve, the well-side flange, and the throat of the involved wellhead itself.

18. The flow of gas from the 9-5/8" production casing by 13-3/8-inch surface casing annulus was from a build-up of shallow formation methane gas that entered the annulus through a gap in the top 161 feet of 9-5/8-inch casing that was filled with water-based mud and not cemented to the shoe or to the 13-3/8-inch surface casing on installation, leaving an interval of formations open to the annulus.

19. Derrick barge operations commenced to replace the damaged wellhead and tree assembly. Flow was reported coming only from the 9-5/8-inch by 13-3/8-inch casing annulus. No flow was exiting either the 9-5/8-inch production casing or the 2-7/8" tubing, indicating the subsurface safety valve was isolating any potential flow from the production interval.

20. When the wellhead was removed, the 2-7/8-inch production tubing was found badly corroded and eroded by long-term exposure to the corrosive environment from the pre-existing tubing hole, and the tubing was parted near the surface, just below the wellhead. All remaining strings of casing were then sawed off below the wellhead assembly and found in good condition.

21. A replacement casing wellhead was installed with a Type U blowout preventer and diverter spool to prevent any further flow. The daily operations reports state that by October 7, 2020, any flow from the Well was stopped, and the Well was capped and secured. The derrick barge operations were demobilized by October 8, 2020.

22. In late November 2020, Magellan began snubbing operations to attempt to fish the previously corroded tubing from the Well, repair or replace the pre-existing tubing hole, and re-establish the parted tubing to surface to return the Well to production. Following extended fishing, 8,190 feet of severely corroded or completely eroded tubing was recovered. Unable to

recover the remaining tubing, Magellan decided to plug and abandon the Well. Cement and mechanical plugs were set and cemented, and the plug and abandonment operation completed on December 28, 2020.

### The Insurance Claim

23.     The policy provides two relevant coverages: "Control of Well Insurance" and "Redrilling/Extra Expense." Control of Well coverage reimburses the insured for actual costs and/or expenses incurred by the insured to regain control of a "Well Out of Control." Redrilling/Extra Expense coverage reimburses the insured for actual costs and/or expenses reasonably incurred by the insured to restore or redrill a well insured that has been lost or otherwise damaged as a result of a covered "Well Out of Control" incident.

24.     Magellan submitted to the Underwriters a total claim of $14,342,751 for the incident. Approximately $6.9 million in claimed costs relate to the initial assessment, well-control efforts, and replacement of the damaged wellhead to stop flow and secure the well. Approximately $7.4 million in claimed costs relate to snubbing operations conducted to attempt to fish the previously corroded tubing from the Well, repair or replace the pre-existing tubing hole, and re-establish the parted tubing to surface to return the Well to production, and to the subsequent plug and abandonment operation.

### Payment of Covered Well-Control Costs

25.     During adjustment of the claim, Magellan requested a partial payment on account of $5 million from approximately $6.9 million in unadjusted well-control expenses. The Underwriters agreed to the partial payment on account under a full reservation of rights because Magellan had not met the indemnity or retention requirements of the policy. The Underwriters

nevertheless paid Magellan $4,825,000 ($5 million less the unmet retention of $175,000) and are in the process of completing the adjustment of well-control costs to pay Magellan the remaining covered well-control costs.

**Compliance with Conditions Precedent**

26. Antares has complied with all conditions precedent of the policy.

**Request for Declaratory Judgment—No Section A Coverage after October 8, 2020**

27. Antares incorporates the foregoing paragraphs of this Complaint.

28. Section A of the policy provides "Control of Well Insurance." The Control of Well insuring agreement reimburses the insured for actual costs and/or expenses incurred by the insured to regain control of a "Well Out of Control," "but only such costs and/or expenses incurred until the well(s) is (are) brought under control as defined" in Section A of the policy.

29. Policy Section A defines a "Well Out of Control" as:

Well out of Control:

For the purposes of this insurance, a well(s) shall be deemed to be out of control only when there is an unintended flow from the well(s) of drilling fluid, oil, gas or water above the surface of the ground or water bottom.

(1) which flow cannot promptly be:

  (a) stopped by use of the equipment on site and/or the blowout preventer, storm chokes or other equipment required by the Due Diligence and Warranties clauses herein; or

  (b) stopped by increasing the weight by volume of drilling fluid or by the use of other conditioning materials in the well(s): or

  (c) safely diverted into production:

or

(2) which flow is declared to be out of control by the appropriate regulatory authority.

      Nevertheless, and for the purposes of this insurance, a well shall not be deemed out of control solely because of the existence or occurrence of a flow of oil, gas or water into the well bore which can, within a reasonable period of time, be circulated out or bled off through the surface controls.

30. Under this definition, the Well was "Out of Control" beginning on or about August 31, 2020, when the subsurface safety valve activated due to low flow, shutting in the Well, and an uncontrolled gas plume was sighted the next day flowing from the side of the wellhead to atmosphere.

31. Policy Section A defines a "Well Brought under Control" as:

Well Brought under Control:

A well(s) deemed out of control in accordance with Paragraph 2a of this Section A shall, for the purposes of this insurance be deemed to be brought under control at the time that:

(1) the flow giving rise to a claim hereunder stops, is stopped or can be safely stopped;

(2) the drilling, deepening, servicing, working over, completing reconditioning or other similar operation(s) taking place in well(s) immediately prior to the occurrence giving rise to a claim hereunder is (are) resumed; or

(3) the well(s) is (are) or can be returned to the same producing, shut-in or other similar status that existed immediately prior to the occurrence giving rise to a claim hereunder; or

(4) the flow giving rise to a claim hereunder is or can be safely diverted into production;

whichever shall first occur, unless the well(s) continues at that time to be declared out of control by the appropriate regulatory authority, in which case, for the purposes of this insurance, the well(s) shall be deemed to be brought under control when such authority ceases to designate the well(s) as being out of control.

32. Under this definition, the Well was "Brought under Control" as of October 8, 2020, once the derrick barge operations were completed that replaced the damaged casing wellhead

and installed a Type U blowout preventer and diverter spool, stopping any continuing flow, and capping and securing the well.

33. Magellan has claimed as covered well-control expense the cost of snubbing operations conducted after October 8, 2020, to attempt to fish corroded tubing from the Well, re-establish the parted tubing to surface, and return the Well to production, and the cost of plugging and abandoning the Well.

34. The Termination of Expenses Clause in policy Section A limits the well-control coverage provided to the period between the time the well goes "Out of Control" until the well is "Brought under Control," as follows:

TERMINATION OF EXPENSES:

In any circumstances, and subject always to the Combined Single Limit of Liability of this policy, Underwriter's liability for costs and/or expenses incurred in regaining or attempting to regain control of a well(s) shall cease when the well(s) is (are) brought under control as defined in Paragraph 2b of this Section A.

35. Any duty of Antares to indemnify Magellan under Section A of the policy is limited to covered well-control expenses Magellan incurred beginning August 31, 2020 when the Well went "Out of Control" and ending October 8, 2020 when the Well was "Brought under Control."

36. Antares has no duty to indemnify Magellan under Section A of the policy for the cost of the snubbing operations claimed by Magellan or for any other cost claimed by Magellan after October 8, 2020 when the Well was "Brought under Control."

37. Antares requests a declaratory judgment in its favor that the Well was "Brought under Control" as of October 8, 2020, and there is no duty to indemnify Magellan under Section A of the policy for any well-control related costs and expenses or any other costs and expenses incurred before August 31, 2020 or after October 8, 2020.

**Request for Declaratory Judgment—No Section B Redrill Coverage**

38. Antares incorporates the foregoing paragraphs of this Complaint.

39. Section B of the policy provides Redrilling/Extra Expense coverage. The Redrilling insuring agreement reimburses the insured for actual costs and/or expenses reasonably incurred to restore or redrill a well insured, or any part thereof, "*which has been lost or otherwise damaged as a result of an occurrence giving rise to a claim which would be recoverable under Section A*" of the policy (emphasis added).

40. Loss or damage to a well that pre-exists the insured event, which is a covered "Well out of Control" incident under Section A, is not caused by or a result of the unintended and uncontrolled flow and does not fall within the insuring agreement.

41. The engineering facts establish, and Magellan has acknowledged, that the Well has been producing since 2015 with approximately 1,100-1,150 psi pressure in the 2-7/8-inch tubing by 9-5/8-inch casing annulus. As of December 2015, the 2-7/8-inch tubing by 9-5/8-inch casing annulus was close to, and tracking, the flowing tubing pressure of 3, 500 psi, indicating full pressure communication between the 2-7/8-inch casing and the 9-5/8-inch casing. These facts confirm the existence of a hole in the tubing before the well-control incident.

42. Magellan has also acknowledged that it chose to continue producing the Well without repairing the production tubing hole and planned to run diagnostics and fix the tubing hole as soon as production from the current producing interval became uneconomical. When that point was reached, Magellan planned a "through tubing" plug back of the interval to move up the Well, perforate and produce the next productive formation.

43. Magellan continued to produce the Well (with the existing tubing hole), for the next five years, exposing the production tubing for an extended time to the well-known corrosive environment in the Gulf of Mexico.

44. Following the loss of control on or about September 1, 2020 from a different annulus between the 9-5/8-inch and 13-3/8-inch casing, the damaged wellhead was removed, and all casings were observed to be in good condition. However, the production tubing was found parted near the surface and in a severely corroded and eroded condition.

45. After the Well was brought under control, Magellan conducted snubbing operations to attempt to fish the previously corroded tubing from the Well, repair or replace the pre-existing tubing hole, and re-establish the parted tubing to surface to return the Well to production. Those efforts were unsuccessful and resulted in the Well being plugged and abandoned.

46. The deteriorated condition and extensive long-term corrosion damage to the production tubing was caused by Magellan's decision to delay repairing the tubing hole. The extensive tubing damage and inability to fish the corroded tubing caused the loss of the Well and is unrelated to the flow of formation gas that occurred from a different annulus during the well-control incident.

47. The Section B Redrilling coverage does not apply because the costs and expenses for the snubbing operations all relate to pre-existing damage to the corroded and holed tubing that was not caused by the well-control incident. The Section B Redrilling coverage also does not apply to any cost or expense for redrilling the Well because the Well was lost due to pre-existing

damage and not because of the flow of gas from a different annulus during the well-control incident.

48.     Antares has no duty to indemnify Magellan under Section B of the policy for any costs or expenses incurred in attempting to repair or restore the pre-existing tubing corrosion, damage, and holes, or for any redrill of the Well.

49.     Antares requests a declaratory judgment in its favor that there is no duty to indemnify Magellan under Section B of the policy.

### Request for Declaratory Judgment—Indemnity Requirement Not Met

50.     Antares incorporates the foregoing paragraphs of this Complaint.

51.     The policy's well-control coverages are written on an indemnity basis, reimbursing the insured for actual costs and/or expenses incurred in regaining control of an "Out of Control" well, and for actual costs and/or expenses reasonably incurred in repairing or restoring a well lost or damaged by a covered "Well Out of Control" incident.

52.     For the policy to respond, the insured must demonstrate that it has incurred expense and sustained an actual out-of-pocket loss by paying costs that are indemnifiable under the policy.

53.     At the time of Underwriters' partial payment to Magellan of the undisputed portion of the well-control claim under Section A, which was made under full reservation of rights, and at the time of the filing of this complaint, Magellan has been unable to provide any evidence that it has paid the costs and expenses for which it seeks coverage under the policy.

54.     In addition to the grounds stated in the previous sections, Antares has no duty to indemnify Magellan under Section A, Section B, or any other section of the policy, because

Magellan has not met the indemnity requirement which is a condition precedent for the policy to apply.

55.   Antares requests a declaratory judgment in its favor that there is no duty to indemnify Magellan under the policy for failure to meet the indemnity requirement.

### Request for Attorney Fees

56.   Antares requests recovery of its attorney fees and costs pursuant to Section 37.009 and Chapter 38 of the Texas Civil Practice and Remedies Code and 28 U.S.C. § 2202.

### Prayer

For the reasons given, Antares Underwriting Limited, on its own behalf as the sole member of Lloyd's of London Syndicate 1274, and as the lead underwriter severally subscribing to energy package policy B1180DQ0068, requests a declaratory judgment in its favor and against Magellan E&P Holdings, Inc., declaring the following:

1) The Mustang Island Block 926 Well MU-926S #1ST was "Brought under Control" as of October 8, 2020;

2) There is no duty to indemnify Magellan under Section A of energy package policy B1180DQ0068 for well-control related costs and expenses incurred before August 31, 2020 or after October 8, 2020;

3) There is no duty to indemnify Magellan under Section B of energy package policy B1180DQ0068 for any costs or expenses incurred in attempting to repair or restore the pre-existing tubing damage, or for any redrill of the Well.

4) There is no duty to indemnify Magellan E&P Holdings, Inc. under energy package policy B1180DQ0068 for the incident involving Mustang Island Block 926 Well MU-

926S #1ST because Magellan has failed to provide evidence that it has paid the actual out-of-pocket costs and expenses for which it seeks coverage;

5) Antares is awarded its reasonable and necessary attorney fees; and

6) Antares is awarded its costs of court and all other relief the court deems appropriate.

Respectfully submitted,

 /s/ M. Matt Jett
M. Matt Jett (TX 24068684) (Fed. No. 1091711)
Attorney-in-Charge
Hall Maines Lugrin, P.C.
Williams Tower, 64th Floor
2800 Post Oak Boulevard
Houston, Texas 77056-6125
Telephone:	713.871.9000
Facsimile:	713.871.8962
Email:	mjett@hallmaineslugrin.com

Of Counsel:
Hall Maines Lugrin, P.C.
Karen K. Milhollin
(TX No. 00790180) (Fed. No. 18038)
2800 Post Oak Blvd., Ste. 6400
Houston, Texas 77056-6125
Telephone:	713.871.9000
Facsimile:	713.871.8962
Email:  kmilhollin@hallmaineslugrin.com

*Attorneys for Plaintiff Antares Underwriting Limited, on its own behalf as the sole member of Lloyd's of London Syndicate 1274, and as the lead underwriter severally subscribing to energy package policy B1180DQ0068*